# In the United States Court of Federal Claims

No. 14-863
Filed: August 8, 2019
Reissued: September 6, 2019[1]

---

JORDIA NUNEZ, et al.,

    Petitioners,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

    Respondent.

---

Vaccine Case; Motion for Review;
Sudden Infant Death Syndrome; *Althen*;
Burden of Proof; Causation Analysis

*Silvia Chin-Caplan*, Law Office of Sylvia Chin-Caplan, Boston, MA, for petitioners.

*Robert Paul Coleman III*, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent.

**OPINION**

***SMITH*, Senior Judge**

    Petitioners, Jordia Nunez and John Diaz, on behalf of their deceased minor child, J.J.D. ("J.J."),[2] seek review of an entitlement decision issued by Special Master Herbrina D. Sanders denying their petition for vaccine injury compensation. Petitioners brought this action pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10–34 (2012) ("Vaccine Act"), alleging that the death of their minor son from Sudden Infant Death Syndrome ("SIDS") was caused by "adverse effects" of hepatitis B virus ("HBV"); rotavirus; Diphtheria-Tetanus-acellular Pertussis ("DTaP"); haemophilus influenza type B ("HiB"); inactivated polio ("IPV"); and pneumococcal conjugate vaccines that he received during his four-month well-child visit on November 14, 2012. The Special Master denied compensation, finding that petitioners failed to carry their legal burden of establishing causation. *Nunez et al. v. Sec'y of Health & Human Servs.*, 2019 WL 2462667 (Fed. Cl. Spec. Mstr. Mar. 29, 2019)

---

[1]     An unredacted version of this opinion was issued under seal on April 19, 2018. The parties were given an opportunity to propose redactions, but no such proposals were made.

[2]     J.J.D. was referred to as "J.J." throughout the Special Master's decision. As such, the Court will use J.J. throughout the Opinion.

("*Nunez*"). Petitioners now move this Court to review the decision. For the reasons that follow, the Court **DENIES** petitioners' Motion.

I.  BACKGROUND

A brief recitation of the facts provides necessary context.[3]

In 2012, Ms. Nunez became pregnant with twins. Due to Ms. Nunez's medical history and her pregnancy being a twin gestation, doctors considered the pregnancy high risk. On July 11, 2012, Ms. Nunez naturally delivered twins, who were born at approximately twenty-nine weeks and two days' gestation. Due to his prematurity and episodes of respiratory distress, J.J. remained in the neonatal intensive care unit ("NICU") after delivery. The NICU discharged J.J. home in stable condition on August 31, 2012.

Dr. Yves Verna received J.J. on September 13, 2012, for his two-month well-baby examination. At that appointment, J.J. received his rotavirus, DTaP, HiB, IPV, and pneumococcal conjugate vaccines. Dr. Verna instructed J.J.'s parents to give him Tylenol every four hours for forty-eight hours after vaccination.

On November 14, 2012, Dr. Verna performed J.J.'s four-month well-baby examination and documented no abnormalities during the examination. During this appointment, J.J. received the HBV, rotavirus, DTaP, HiB, IPV, and pneumococcal conjugate vaccines. Notes taken during the examination show that the vaccines were administered between 5:40 p.m. and 6:24 p.m. Dr. Verna again instructed J.J.'s parents to give him Tylenol every four hours for forty-eight hours after his second round of vaccinations.

The following day, on November 15, 2012, a 911 call was placed from Ms. Nunez's residence at 9:49 a.m. The caller stated that J.J. was not breathing, and Emergency Medical Services ("EMS") arrived at petitioners' home around 9:53 a.m. The EMS crew members found J.J. unresponsive but found no injuries upon physical examination. Once J.J. arrived at the hospital, he was pronounced dead at 10:23 a.m.

Dr. Ye Aung, the attending physician at the hospital, transcribed notes that provide the following timeline of events provided by petitioners at the hospital on the day of J.J.'s death. J.J. was cranky after he received the vaccines, and petitioners gave him Tylenol. Petitioners fed J.J. formula at 9:30 p.m., and placed him in the same bed as his twin sister around 11:00 p.m. Ms. Nunez checked on J.J. and his twin sister around 8:30 a.m. and found them both asleep. Mr. Diaz brought J.J.'s twin into the living room after she woke around 9:00 a.m. When Ms. Nunez checked on J.J. at 9:30 a.m., she saw that his face was blue, and discovered that he was unresponsive. She immediately called 911 and began cardiopulmonary resuscitation.

---

[3]   As the basic facts in this case have not changed significantly since the Special Master's earlier decision in *Nunez*, the Court's recitation of the background facts herein draws from that decision.

An autopsy performed by Dr. James Gill on November 16, 2012, found the cause of death to be SIDS.[4] Dr. Hernando Mena examined J.J.'s brain on November 27, 2012, and diagnosed him with subdural[5] hemorrhage[6] organized, cerebral[7] convexities;[8] and gliosis,[9] brain stem nuclei.

Petitioners filed their vaccine petition on September 17, 2014, pursuant to the Vaccine Act. Petitioners amended their petition on June 19, 2015, alleging that the adverse reaction from the vaccines administered on November 14, 2012, resulted in their son's death. *See* Amended Petition at 1. Additionally, petitioners filed an expert report authored by Dr. Douglas Miller,[10] a neuropathologist, on June 19, 2015. Respondent filed two expert reports on November 19, 2015; the first authored by Dr. Christine McCusker,[11] and the second authored by Dr. Rebecca Folkerth[12]. In response, on January 19, 2016, petitioners filed a supplemental expert report

---

[4] Sudden Infant Death Syndrome is defined as "the sudden and unexpected death of an apparently healthy infant, typically occurring between the ages of three weeks and five months, and not explained by careful postmortem studies." *Dorland's Illustrated Medical Dictionary* 1850 (32nd ed. 2012) (hereinafter "*Dorland's*").

[5] Subdural is defined as "between the dura mater and the arachnoid." *Dorland's* 1790.

[6] Hemorrhage is defined as "the escape of blood from the vessels; bleeding." *Dorland's* 842.

[7] Cerebral refers to the cerebrum, which is defined as "the main portion of the brain occupying the upper part of the cranial cavity; its two hemispheres . . . , united by the corpus callosum, form the largest part of the central nervous system in humans." *Dorland's* 332.

[8] Convexity is defined as "a rounded, somewhat elevated area on the surface of an organ or other structure." *Dorland's* 411.

[9] Gliosis is "an excess of astroglia in damaged areas of the central nervous system." *Dorland's* 784.

[10] Dr. Miller received his medical degree from the University of Miami School of Medicine in 1978. In 1980, he received a PhD in physiology and biophysics from the same. Petitioners' Exhibit (hereinafter "Pet'rs' Ex.") 12 at 1. Dr. Miller is board certified in neuropathology and anatomic pathology. *Id.* He currently works as a clinical professor in the Department of Pathology and Anatomical Sciences at the University of Missouri School of Medicine. *Id.* In addition to his role as professor, he serves as an associate medical examiner at the University of Missouri, providing forensic autopsy services. *Id.* at 2.

[11] Dr. Christine McCusker is board certified in pediatrics. Respondent's Exhibit (hereinafter "Resp't's Ex.") B at 2. Dr. McCusker received her Master of Science and her M.D. from McMaster University in Hamilton, Ontario. *Id.* at 1. She currently works as a staff physician in the Emergency Department of Montreal Children's Hospital, and as an associate professor in the Department of Pediatrics, Division of Allergy and Immunology (Pediatric) of Montreal Children's Hospital and McGill University. *Id.* at 3.

[12] Dr. Rebecca Folkerth graduated with a medical degree from the University of Louisville School of Medicine. Resp't's Ex. C at 2. She is board certified in anatomic pathology, neuropathology, and cytopathology. *Id.* Dr. Folkerth is currently a clinical associate professor at

written by Dr. Douglas Miller. Respondent filed a supplemental expert report authored by Dr. McCusker on April 11, 2016, and a supplemental expert report authored by Dr. Folkerth on April 14, 2016. Petitioners filed a second supplemental expert report authored by Dr. Miller on April 4, 2017. On February 22 and 23, 2018, Special Master Herbrina Sanders held an entitlement hearing in Washington, D.C. On March 29, 2019, Special Master Sanders denied petitioners' claim, finding that petitioners failed to provide preponderate evidence that the vaccines J.J. received on November 14, 2012, caused his death. *See* Decision of the Special Master (hereinafter "Dec.") at 1–2.

Petitioners filed their Motion for Review on April 29, 2019. *See generally* Motion for Review (hereinafter "MFR"). Respondent filed its Response to petitioners' Motion for Review on May 28, 2019. *See generally* Response to Respondent's Motion for Review (hereinafter "Resp."). Petitioners' Motion is fully briefed and ripe for review.

## II.     STANDARD OF REVIEW

Under the Vaccine Act, this Court may review a special master's decision upon the timely request of either party. *See* 42 U.S.C. § 300aa-12(e)(1)–(2). Upon receiving a timely request, the Court may: "(A) uphold the findings of fact and conclusions of law. . . , (B) set aside any findings of fact or conclusion of law . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . , or, (C) remand the petition to the Special Master for further action in accordance with the court's direction." *Id.* § 300aa-12(e)(2)(A)–(C). Findings of fact and discretionary rulings are reviewed under an "arbitrary and capricious" standard, while legal conclusions are reviewed *de novo*. *Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

This Court cannot "substitute its judgment for that of the special master merely because it might have reached a different conclusion." *Snyder ex rel. Snyder v. Sec'y of Dep't of Health & Human Servs.*, 88 Fed. Cl. 706, 718 (2009). "Reversal is appropriate only when the special master's decision is arbitrary, capricious, an abuse of discretion, or not in accordance with the law." *Id.* Under this standard, a special master's decision "must articulate a rational connection between the facts found and the choice made." *Cucuras v. Sec'y of Dep't of Health & Human Servs.*, 26 Cl. Ct. 537, 541–42 (1992), *aff'd*, 993 F.2d 1525 (Fed. Cir. 1993) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). This standard is "highly deferential." *Hines v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Id.*

---

New York University School of Medicine in the Forensic Medicine Department, and is the neuropathologist for the Office of the Chief Medical Examiner in New York City. Transcript of Proceedings (hereinafter "Tr.") 124:7–10.

## III. DISCUSSION

*Althen v. Secretary of Health & Human Services* provides the evidentiary burden for petitioners attempting to succeed in a vaccine petition based on causation. *See generally Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005). There are two means of proving causation under the Vaccine Act: (1) showing that the injury falls under the Vaccine Injury Table, which provides a presumption of causation; and (2) proving causation-in-fact for an injury not listed on the Vaccine Injury Table. *See id.* at 1278 (citing 42 U.S.C. §§ 300aa-14(a), -13(a)(1), -11(c)1(C)(ii)(I)). The latter applies to this case, thus, in order to prove causation-in-fact, a petitioner must

> show by preponderant evidence that the vaccination brought about [petitioner's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.* at 1278. To meet the preponderance standard and succeed on the claim, petitioners must provide a "reputable medical or scientific explanation" for their claim. *See id.*

Petitioners make two numbered objections to the March 29, 2019 decision. *See* MFR at 5, 24. First, petitioners assert that the Special Master erroneously heightened petitioners' burden of proof required under *Althen* prongs I and II. MFR at 5. Second, petitioners argue that the Special Master abused her discretion by failing to review the record as a whole, relying on respondent's expert despite the Special Master's criticism of the expert's testimony. MFR at 24.

### A. *Althen* Prongs One and Two

In proceedings before the Special Master, petitioners relied upon the Triple Risk Model[13] as the medical theory causally connecting J.J.'s vaccinations to his death. MFR at 5. The Triple Risk Model, first introduced by James F. Filiano and Hannah C. Kinney, provides the working, theoretical explanation for SIDS deaths. *See* Pet'rs' Ex. 12 at 4. All three expert reports acknowledge the legitimacy of the Triple Risk Model. *See* Pet'rs' Ex. 12 at 4; Resp't's Ex. C at 5–6; Resp't's Ex. A at 2–3. The Triple Risk Model posits that the following three converging factors are typically present in SIDS deaths: "(1) a vulnerable infant; (2) a critical developmental period in homeostatic[14] control[;] and (3) an exogenous stressor." Pet'rs' Ex. 14 at 2.

---

[13] *See* James J. Filiano & Hannah C. Kinney, *A Perspective on Neuropathology Findings in Victims of Sudden Infant Death Syndrome: The Triple-Risk Model*, 65 Biology of the Neonate 194 (1994).

[14] Homeostasis means:

> a tendency to stability in the normal body states (internal environment) of the organism. It is achieved by a system of control mechanisms activated by negative

"According to this model, an infant will die of SIDS only if he/she possesses all three factors; the infant's vulnerability lies latent until he/she enters a critical developmental period and is subject to an exogenous stressor which matches the infant's underlying vulnerability and overwhelms an already compromised homeostatic system." *Id.*

During the entitlement hearing, petitioners and respondent disputed the applicability of the first factor in the Triple Risk Model. *See* Dec. at 11. While the Special Master initially identified J.J.'s male gender and prematurity as increasing his risk of SIDS, the Special Master analyzed evidence of a defect in J.J.'s brain to determine whether J.J. qualified as a vulnerable infant. *See* Dec. at 12–16. Dr. Miller stated that medical and scientific literature has shown that "the brain structures responsible for regulation of respiration, including those that sense increased blood carbon dioxide levels during sleep and respond[] to them with arousal and increased (gasping) breathing, reside in the medulla [oblongata][15] in a network of nuclear structures which use serotonin[16] as their neurotransmitter."[17] Dec. at 12 (citing Pet'rs' Ex. 12 at

---

> feedback; e.g., a high level of carbon dioxide in extracellular fluid triggers increased pulmonary ventilation, which in turn causes a decrease in carbon dioxide concentration.

*Dorland's* 867.

[15] The medulla oblongata is:

> the truncated cone of nerve tissue continuous above with the pons and below with the spinal cord. It lies anterior to the cerebellum, and the upper part of its posterior surface forms the floor of the lower part of the fourth ventricle; it contains ascending and descending tracts, and important collections of nerve cells that deal with vital functions, such as respiration, circulation, and special senses.

*Dorland's* 1121.

[16] Serotonin is:

> a monoamine vasoconstrictor, synthesized in the intestinal chromaffin cells or in central or peripheral neurons and found in high concentrations in many body tissues, including the intestinal mucosa, pineal body, and central nervous system. Produced enzymatically from tryptophan by hydroxylation and decarboxylation, it has many physiologic properties, such as inhibition of gastric secretion, stimulation of smooth muscle, serving as a central neurotransmitter, and being a precursor of melatonin.

*Dorland's* 1699.

[17] A neurotransmitter is "any of a group of substances that are released on excitation from the axon terminal of a presynaptic neuron of the central or peripheral nervous system and travel across the synaptic cleft to either excite or inhibit the target cell." *Dorland's* 1271.

4). Dr. Miller described the arcuate nuclei[18] as "the primary carbon dioxide sensor in the brain," and an important sensor within the network described above. Tr. 43:23–25; Pet'rs' Ex. 12 at 4. He further explained that a defect in the brain structure responsible for regulation of the respiratory system can prove life-threatening for an infant when an external stressor is added. *See* Tr. 41:5–44:20. Dr. Miller opined that during examination of J.J.'s brain, the arcuate nuclei in the single section of medulla were "at least somewhat hypoplastic."[19] Pet'rs' Ex. 12 at 4. Thus, based on the evidence, the Special Master, found that it was "more likely than not that J.J. had a brain defect," and that J.J. qualified as a "vulnerable infant" in accordance with the first factor of the Triple Risk Model due to his male gender, prematurity, and brain defect. *See* Dec. 16.

Turning to the second factor, whether J.J. was in a critical developmental period was not in dispute, as he was four months old when he died, and the critical development period is considered the first year of life under the Triple Risk Model. *See* Dec. at 16. Therefore, the Special Master summarily found that J.J. was in a critical development period and fulfilled the second factor under the Triple Risk Model. *Id.*

Finally, the Special Master examined multiple possible exogenous factors linked with J.J.'s death. Dr. McCusker explained in her report that exogenous factors are "those elements which may contribute to a change in the mechanics of respiration, as opposed to the neurochemical." Resp't's Ex. A at 3. Examples of exogenous factors include: "prone or side sleeping, bed sharing, over-bundling, soft bedding, face covered and upper respiratory tract infection." Resp't's Ex. A at 3. Dr. McCusker identified J.J.'s co-sleeping with his twin, bottle feeding, and an upper respiratory tract infection ("URI") as exogenous factors that contributed to J.J.'s death. Resp't's Ex. A at 3. Dr. Folkerth identified the relevant exogenous factors to include J.J.'s premature birth, the existence of "additional known risk factors of a potentially unsafe sleeping environment (co-sleeping with his twin), and male gender." Resp't's Ex. C at 7. During the entitlement hearing before the Special Master, Dr. Folkerth noted a potential additional risk factor as J.J.'s alleged runny nose and cold at the time of his death, which petitioners noted in their affidavits. *See* Tr. 135:5–7. Lastly, Dr. Miller opined that J.J.'s intrinsic risk factors were prematurity and male gender. *See* Tr. 80:25–81:6. However, Dr. Miller stated that "the most important potential external stressor" was the vaccinations J.J. received on November 14, 2012. *See* Pet'rs' Ex. 12 at 4.

The Special Master found that it was more likely than not that J.J. had a runny nose, but that he was not suffering from a URI. *See* Dec. at 25. Additionally, the Special Master found that "co-sleeping was not a relevant risk factor in this case" based on respondent's concession after testimony from Ms. Nunez, and further determined that J.J.'s partial bottle feeding was not a significant factor. *Id.* at 18–20. Special Master Sanders also determined that the use of the

---

[18] Arcuate nuclei are "one of the group of small, irregular areas of gray substance found on the ventromedial aspect of the pyramid of the medulla oblongata." *Dorland's* 1295.

[19] Hypoplasia means "incomplete development or underdevelopment of an organ or tissue; it is less severe in degree than aplasia." *Dorland's* 905.

receiving blanket "based on Ms. Nunez's description of how she loosely tucked it around J.J.'s legs, was not a relevant risk factor for SIDS." *Id.* at 20. Thus, the central argument examined in the Special Master's Decision is Dr. Miller's claim that the November 14, 2012 vaccinations were an exogenous stressor leading to J.J.'s SIDS death.

Special Master Sanders rejected Dr. Miller's theory of vaccinations as an exogenous stressor and found that petitioners failed to show causation-in-fact under the *Althen* standard. In their Motion for Review, petitioners argue that Special Master Sanders required direct evidence of a specific biological mechanism rather than merely a plausible theory that demonstrates a logical sequence of cause and effect pursuant to *Althen* prongs I and II. *See* MFR at 5. For the following reasons, the Court finds that the Special Master did not heighten petitioners' burden of proof under *Althen* prongs I and II.

Petitioners theorize that "J.J. ultimately succumbed to SIDS because increased levels of cytokines[20] in his brain disrupted his 5-HT[21] system and his arousal system failed," and the increased levels of cytokines stemmed from vaccination and moved through the blood stream to cross the blood-brain barrier to the central nervous system. Dec. at 46. In their Motion for Review, petitioners argue that the Special Master improperly "heightened petitioners' burden of proof by requiring the demonstration of a precise biological mechanism, evidence that cytokines were produced near J.J.'s vaccination site, migrated to the [Central Nervous System] and crossed the blood-brain barrier." MFR at 10. Petitioners also claim that "multiple sources of circumstantial evidence . . . support that vaccination produces cytokines, cytokines can breach the blood brain barrier either directly or indirectly, and that cytokines inhibit the serotonergic system to suppress arousal." *Id.* at 11. As respondent correctly points out, the Special Master did not require identification and proof of a specific biological mechanism. However, the Special Master required that if petitioners presented a specific biological mechanism, then it must be logical. Dec. at 50.

When a Special Master finds petitioners' theory unconvincing, the Special Master does not necessarily raise petitioners' burden. *LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334, 1340 (Fed. Cir. 2014) (affirming the special master's conclusion that petitioner's theory of causation was unconvincing without improperly requiring petitioner's expert to provide proof of the proposed mechanism). Special Master Sanders correctly explained that "to require identification and proof of specific biological mechanisms would be inconsistent with the purpose and nature of the vaccine compensation program." Dec. at 50 (citing *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)) (internal citations omitted). In this case, the Special Master carefully examined each element of Dr. Miller's theory, but found that: (1) he failed to present evidence of an active transport system for the cytokines to enter the brain, and (2) his arguments were undermined by the fact that J.J. had a defective brainstem as

---

[20] Cytokines are "a generic term for nonantibody proteins released by one cell population (e.g. primed T lymphocytes) on contact with specific antigen, which act as intercellular mediators, as in the generation of an immune response." *Dorland's* 466.

[21] 5-HT refers to 5-hydroxytryptamine, or serotonin, which is defined above.

"cytokines need a normal brainstem to affect the 5-HT system because it is through functioning receptors that their messages are received." Dec. at 51. Special Master Sanders concluded that these findings proved fatal to Dr. Miller's theory that an increase in cytokine production levels directly led to the failure to rouse J.J., resulting in his death. *See* Dec. at 50–51. Accordingly, the Court finds that the Special Master did not heighten petitioners' burden of proof required under *Althen* prongs I and II.

### B. Weight of Expert Opinions

Petitioners' second numbered objection states that the Special Master failed to review the record as a whole and relied on the testimony of Dr. McCusker after criticizing her testimony. MFR at 24. In her Decision, Special Master Sanders found that "Dr. McCusker can, at times, overstate her position, particularly as it relates to providing support to some of her conclusions." Dec. at 51. Specifically, the Special Master identified as unnecessary overreach Dr. McCusker's addition of the loosely tucked sheet as a risk factor as well as her later withdrawal of the assertion that several studies showed increased carbon dioxide associated with infants having a URI. *See* Dec. at 51–52. In their Motion for Review, petitioners identify additional alleged issues with Dr. McCusker's testimony, and contend that the Special Master failed to address those problems. *See* MFR at 25–33. Respondent argues that the Special Master appropriately criticized Dr. McCusker's testimony in her Decision, and that she adequately examined both experts in finding Dr. McCusker's explanations for why Dr. Miller's theory must fail was credible. *See* Resp. at 13. The Court finds that Special Master Sanders neither abused her discretion nor acted contrary to law, as she appropriately considered the record as a whole and adequately explained her determinations as to the reliability of the evidence and credibility of the expert witnesses.

It is well-established that this Court does "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Heath & Human Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011) (stating that the United States Court of Appeals for the Federal Circuit applies the same standard of review over the special master's decision as the Court of Federal Claims applies in its review of the special master's decision). Respondent correctly points out that the Special Master's analysis of the evidence is consistent with the requirements established under the Vaccine Program. *See* Resp. at 13. While petitioners argue that Dr. McCusker's testimony was not adequately addressed by the Special Master in her decision, Special Master Sanders explained that all testimony was thoroughly reviewed even if not referenced in the Decision. Dec. at 52.

In addition to evidence at the entitlement hearing, the Special Master considered multiple prior vaccine cases where petitioners alleged vaccines caused SIDS. *See* Dec. at 47–50. Special Master Sanders identified one prior case where petitioners were initially successful on this theory, but where the Court of Federal Claims ultimately reversed the special master's decision. *See Boatman v. Sec'y of Health & Human Servs.*, 2017 WL 3432329 (Fed. Cl. Spec. Mstr. July 10, 2017), *rev'd*, 138 Fed. Cl. 566 (2018) (reversing the special master's decision for applying

too low of a standard where the special master accepted petitioners' theory of liability based on SIDS under the Triple Risk Model). As stated in Special Master Sanders' decision, "[t]his theory has been unsuccessfully litigated in the Program previously, and Dr. Miller did not present any new persuasive evidence." Dec. at 52. Accordingly, the Court finds that the Special Master appropriately reviewed the record as a whole and articulated a rational basis for her decision to rely on Dr. McCusker's testimony.

## IV.     CONCLUSION

This Court finds that the Special Master's decision was neither an abuse of discretion nor contrary to law, and that the Special Master's findings were neither arbitrary nor capricious. For the foregoing reasons, the Court **DENIES** petitioners' Motion for Review.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge